**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **THE CITY OF KANSAS CITY, MISSOURI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 05-0368-CV-W-GAF** |
| | ) | |
| **HOUSING & ECONOMIC DEVELOPMENT** | ) | |
| **FINANCIAL CORPORATION, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT**

**FINDINGS OF FACT**

1.      The City of Kansas City, Missouri, ("City") regularly received funds from the U.S. Department of Housing and Urban Development ("HUD") designated for assisting eligible low income residents to obtain affordable housing, for constructing and rehabilitating such affordable housing, and for redeveloping blighted neighborhoods.

2.      For more than twenty years, the City has entrusted the Housing & Economic Development Financial Corporation ("HEDFC"), and its predecessors, as one of its "subrecipients" to receive the foregoing HUD funds on the City's behalf and thereafter to administer and use the funds pursuant to applicable federal laws and HUD regulations as its trustee in conformance with all applicable federal laws and regulations, including but not limited to the HOME Investment Partnerships Act ("HOME Program") and the Community Development Block Grant ("CDBG") Programs.

3.      The City designated HEDFC as its "subrecipient" trustee for the purpose of enabling HEDFC to administer and use properly all of the City's allocated HUD program funds in accordance with all applicable federal laws and regulations.

4.     HEDFC managed certain loan, development and administrative services in the following areas: (1) Housing Loan and Development Programs; (2) Economic Development Services; (3) Public Facilities Services; (4) Home Ownership Counseling Services; and (5) Administrative and Regulatory Services.

5.     The City placed significant trust in HEDFC to administer the HUD funds appropriately to benefit eligible low income residents to obtain affordable housing, for constructing and rehabilitating such affordable housing, and for redeveloping blighted neighborhoods.

6.     In so placing significant trust in HEDFC, the City reposed special trust and confidence in HEDFC to acquire a full understanding of such governing federal laws and regulations, and thereafter to administer and use the HUD program funds allocated to the City in accordance with that authority and with the stated goals of the HOME and CDBG Programs.

7.     While the City is and has been generally aware of the administration of the HUD funds, it entrusted HEDFC to administer those funds appropriately and in conformance with all federal laws and regulations.

8.     HEDFC, as a subrecipient of HUD funds, was required to obtain and familiarize itself with, and to adhere to, all federal laws and regulations governing its administration and use of the HUD funds as the City's "subrecipient" and trustee.

9.     As a subrecipient of HUD funds, HEDFC was to obtain and familiarize itself with and comply with all federal laws and regulations, the City entrusted the HUD funds to HEDFC and relied on HEDFC's knowledge of the appropriate administration of HUD funds which knowledge was superior to that of the City in relation to the use and application of those funds by HEDFC.

2

10. The City entirely relied upon HEDFC to acquire this knowledge and discharge these duties and rendered itself subservient to HEDFC in regard to the discharge of these duties and unaware of the application of the laws and regulations to the particular transactions before the Court, so that HEDFC was charged with the requisite knowledge, and the administrative and operational control, of the HUD program elements and funds allocated to the City, and so entrusted to HEDFC.

11. Beyond the City relying on HEDFC to obtain familiarize and comply with all federal laws and regulations, HEDFC indicated to the City that it was fully aware of the governing federal law and regulations and that it was in full compliance with such federal law and regulations.

12. The City ceased providing federal funds to HEDFC, and the City removed the HEDFC as a designated "subrecipient" for receipt and administration of such funds.

**Blue Hills Take Part LP**

13. Blue Hills Take Part, LP ("BHTP") is a Missouri limited partnership, of which Blue Hills Development Company ("BHDC") is a general partner.

14. In 1989, BHTP developed two apartment complexes located at 1214-1218 Brush Creek ("Brush Creek Apartments") and 3532 Troost ("Troost Apartments"), using $130,000.00 borrowed from Boatmen's Bank, now Bank of America ("BOA"), in two separate first mortgage loans and $270,000.00 borrowed from HDCIC, HEDFC's predecessor, through two separate second mortgage loans.

15. The funds loaned by HEDFC to BHTP were federal funds provided by HUD for the benefit of federally funded housing programs.

3

16.     On May 24, 1989, HDCIC made two non-recourse, interest-free, second-mortgage loans to BHTP for $90,000.00 for the Troost Apartments and $180,000.00 for the Brush Creek Apartments.  These loans required an initial monthly payment of $40.00 that, after payment to BOA of the first mortgage loans, was to increase to $279.00 for the Troost Apartments and $558.00 for the Brush Creek Apartments.

17.     By January 2004, the Troost Apartments loan was approximately three years delinquent, and the Brush Creek Apartments loan was approximately five years delinquent.

18.     On January 22, 2004, and February 11, 2004, HEDFC issued default notices to BHTP.  On March 3, 2004, HEDFC granted an additional 30 days to cure the default, but no cure was made.

19.     In December 15, 2004, HEDFC was notified that Autin & Huerta Properties ("AHP") and Laurie L. Gelles ("Gelles") had contracts to purchase both apartment complexes.

20.     On January 3, 2005, HEDFC accepted a combined discounted payment of $178,000.00 for both loans which had a combined balance of $260,437.00, resulting in a combined write-down of $82,437.00.

## Mount Cleveland II, Inc.

21.     Mount Cleveland II is a five duplex project constructed for low income borrowers.

22.     The developers, Swope Community Builders, Inc., and its non-profit affiliate Mount Cleveland II, Inc., borrowed $1,219,522.00 from HEDFC for construction of the project.

23.     The funds loaned by HEDFC to Mount Cleveland II, Inc., were federal funds provided by HUD for the benefit of federally funded housing programs.

4

24.     Karl Arterbury served as president of HEDFC and its predecessor entity for many years prior to the Fall of 2002.

25.     From January 1, 2003, until August 30, 2004, Mr. Arterbury provided consulting services to HEDFC.

26.     HEDFC paid Mr. Arterbury a rate of $50.00 per hour for his consulting work with regard to the Mount Cleveland II project.

27.     Mr. Arterbury was also providing consulting services through his company, Arterbury & Associates, to Swope Community Builders on the Mount Cleveland II project.

28.     Mr. Arterbury received a $16,000.00 payment out of the proceeds of the closing of Mount Cleveland II's loan from HEDFC.

29.     The above-described payment to Mr. Arterbury from CDBG funds was made for services provided less than one year following his employment with the HEDFC.

30.     In total, HEDFC paid $16,000.00 in federal funds to Mr. Arterbury for his services.

**Roanoke Court Associates**

31.     On April 30, 1986, HDCIC issued a $300,000.00 second mortgage loan to Roanoke Court Associates for development of multi-family resident units located at 3659-3679 Summit.

32.     The funds loaned by HEDFC to Roanoke Court Associates were federal funds provided by HUD for the benefit of federally funded housing programs.

33.     Premier Bank issued a $1,745,000.00 first mortgage.

34.     The HEDFC loan carried 5% interest with $50.00 per month interest payments until May 1, 2006, when the monthly payments were to increase to $2000.00.  The loan also

required payment of 35% of any surplus cash flow from the project as determined from financial statements to be provided by Roanoke Court.

35.    On October 15, 1993, the loan was modified to reduce the interest rate to 0% and forgive past unpaid interest. The 35% surplus provision remained in place but any such payments were to be applied to the principal.

36.    Roanoke Court ceased making interest payments in February 1992, and it never made any surplus cash payments.

37.    Roanoke Court only submitted financial statements from January through September of 1993.

38.    On March 31, 2003, HEDFC demanded Roanoke Court submit all past financial statements, but it appears that Roanoke Court did not respond.

39.    There was no evidence in the HEDFC file that HEDFC made any further efforts to obtain the financial statements.

40.    On September 2, 2003, HEDFC sold the note to one of the Roanoke Court investors for $117,000.00 and wrote off the remaining balance of $175,850.00.

41.    There was no evidence in the HEDFC file that, prior to discounting the note for sale to the investor, HEDFC investigated the past financial performance of Roanoke Court for purposes of the 35% surplus cash payments or the ability of Roanoke Court to make payments under the terms of the note.

42.    Instead of conducting any investigation of the ability of Roanoke Court to repay HEDFC under the terms of the note, HEDFC discounted the note 60% and sold it to an investor in the company that failed to pay on the note for 12 years.

6

43.     Because HEDFC failed to conduct an investigation of Roanoke Court's ability to repay the HEDFC note and instead sold it to a Roanoke Court investor at a 60% discount, HEDFC lost $175,850.00 in federal funds that could have been used by HEDFC for the benefit of federally funded housing programs.

## East Meyer I

44.     In 1988, Kansas City Capital Partners ("KCCP"), also know as "East Meyer I," acquired twenty-five properties on East Meyer Boulevard, using a $165,000.00 first mortgage loan from HDCIC, consisting of five $33,000.00 notes that were funded with federal funds provided by HUD for the benefit of federally funded housing programs.

45.     In the fall of 2000, HEDFC agreed to subordinate its $165,000.00 first mortgage position in the properties to Douglass National Bank as a condition of a first mortgage loan of $710,000.00 from Douglass to KCCP.

46.     KCCP defaulted on the Douglass loan and a foreclosure sale was held on March 14, 2003.

47.     At the foreclosure sale, HEDFC purchased the properties from Douglass for $795,910.37.

48.     The purchase price was funded by a $2.5 million line of credit extended by Douglass to HEDFC.

49.     The loan was funded in two amounts of $622,330.37 and $173,580.00 with the $173,580.00 being used to satisfy the HUD financed HEDFC second position on the foreclosure, plus $8,580.00 of foreclosure servicing fees charged to HEDFC by Douglass Bank.

50.     As collateral for the $2.5 million line of credit, HEDFC gave Douglass a first mortgage in the properties and other security interests.

51.     In January 2004, the HEDFC board authorized the sale of sixteen of the properties for the highest and best offer but no less than $40,000.00 each or $640,000.00 for the group.

52.     The HEDFC files did not contain any appraisals or references to appraisers or appraisal dates.

53.     On January 16, 2004, Anthony Jackson offered to buy the sixteen properties for $640,000.00 which was the lowest HEDFC approved selling price, but on February 22, 2004, HEDFC internal correspondence indicated that Mr. Jackson did not obtain a financing commitment.

54.     On January 22, 2004, Aandrea Carter of Carter Congress, LLC, offered to buy the sixteen properties for $640,000.00 which was the lowest HEDFC approved selling price.

55.     On March 17, 2004, Carter Congress closed on the purchase of the sixteen properties for $640,000.00.

56.     On the same day, March 17, 2004, Carter Congress closed a re-sale of the sixteen properties to KC-JE-3 LLC for $796,000.00.

57.     As a result of the re-sale, Carter Congress reaped a $156,000.00 profit in less than one day.

58.     There was no evidence in the HEDFC file that HEDFC made any attempt to determine the market value of the properties prior to creating a minimum sale price; made any attempt to publicly and competitively seek the highest price; or made any other attempt to sell the sixteen properties for more than the minimum price.

59.     HEDFC expended cash funds from both federal and private funding sources on the East Meyer I properties, but HEDFC failed to maintain segregation of accounts between

8

federal and private funds generally and specifically with regard to the East Meyer I properties and the proceeds from their sale.

60.     Because HEDFC failed to make any effort to determine the market value of the sixteen properties or sell the sixteen properties for more than the minimum price, HEDFC lost at least $156,000.00 in federal funds that could have been used by HEDFC for the benefit of federally funded housing programs.

### Metropolitan Housing, L.P.

61.     Metropolitan Housing is a sixty unit apartment project owned by Metropolitan Housing, L.P. ("MH"), which is comprised of general partner CDC-Metropolitan Homes, Inc. ("CDC-MH") and limited partner National Equity Fund 1991 Limited Partnership ("NEF1991").

62.     Metropolitan Housing was constructed with an equity investment of $1,428,755.00, a first mortgage loan of $1.1 million held by Boatmen's Bank, and an interest-free, non-recourse second mortgage loan of $1 million held by HEDFC, originally held by HDCIC.

63.     The funds loaned by HEDFC to Metropolitan Housing were federal funds provided by HUD for the benefit of federally funded housing programs.

64.     Metropolitan Housing construction was completed by June 1994.

65.     The terms of the HEDFC loan required a monthly payment of a $1,175.00 carrying finance fee from July 1, 1993 through July 1, 2008, unless the Boatmen's loan was paid off earlier at which time the payment was to increase to $10,500.00 per month.  Any remaining balance was due on the balloon date of July 1, 2023.

66.     MH was also required to fund a replacement reserve fund with monthly payments of $1,056.67.

9

67.     On December 21, 1994, the loan terms were modified to reduce the monthly carrying finance fee payments to $583.33; extend the monthly carrying finance fee to July 1, 2010; and, in years in which operations generated a surplus, require an annual additional payment equal to the lesser of $7,100.00 or 25% of the surplus. On June 28, 1995, the loan terms were modified again to return the monthly carrying finance fee payments to the $1,175.00 level.

68.     As part of the 1994 modification of the HEDFC loan, HEDFC loaned an additional interest-free and non-recourse $50,000.00.

69.     In 1995, MH made $3,499.98 in carrying finance fee payments but did not make any further payments until 2004. MH has made all carrying finance fee payments for all months from July 2004 to the present date.

70.     HEDFC issued notices of default on April 7, 2003, July 17, 2003, and January 21, 2004, without response from MH.

71.     On February 6, 2004, Douglass National Bank loaned $800,000.00 to MH to pay off the Boatmen's loan, and on July 22, 2004, HEDFC accepted a subordination of its mortgage in exchange for MH's agreement to begin making the required monthly carrying fee payments of $1,175.00.

72.     There was no evidence in the HEDFC files that HEDFC made any effort beyond issuing three notices of default to enforce the terms of the note or collect on the note since 1995.

73.     In total, MH became 126 months delinquent on the HEDFC loan for total delinquency in the amount of $148,050.00.

10

74.     Because HEDFC failed to enforce the terms of the loan, HEDFC lost $148,050.00 in federal funds that could have been used by HEDFC for the benefit of federally funded housing programs.

### Tracy Homes

75.     HEDFC purchased 2518 Tracy for $41,751.68 and purchased 2523 Tracy for $39,770.17 for a total acquisition cost of $81,522 for the two properties collectively known as the Tracy Homes.

76.     On December 28, 2001, HEDFC entered a contract with CA Design Development LLC ("CA Design") whereby CA Design was to perform construction management, quality control inspection, construction monitoring and cost estimation services through the Beacon Hill Development, including the Tracy Homes.

77.     After making requests for documents showing how HEDFC selected the firm to oversee the project, I was not given any documents or supporting data, nor did I find any. I found no evidence in HEDFC files that indicated HEDFC engaged in a formal competitive procurement process before contracting with CA Design.

78     In March 2002, CA Design hired Terry Peak & Associates ("Peak") as general contractor for the Tracy Homes.

79.     Peak began work on the Tracy Homes on April 2, 2002, without a written contract or written scope of work.

80.     Peak hired several subcontractors to perform rehabilitation and restoration work on the Tracy Homes.

11

81. CA Design, Peak and the subcontractors hired by Peak submitted invoices to HEDFC, sometimes directly and sometimes through CA Design, and HEDFC paid at least some of those invoices.

82. Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $63,404.89 to CA Design, and the funds disbursed to CA Design were federal funds provided through HUD for the benefit of federally funded housing programs.

83. Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $300,795.02 to Peak, and the funds disbursed to Peak were federal funds provided through HUD for the benefit of federally funded housing programs.

84. Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $18,600.00 to Rennau Construction Company and the funds disbursed to Rennau Construction Company were federal funds provided through HUD for the benefit of federally funded housing programs.

85. Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $5,178.46 to Global Electric and the funds disbursed to Global Electric were federal funds provided through HUD for the benefit of federally funded housing programs.

86. Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $6,290.00 to Superior Sheetmetal Co., Inc., and the funds disbursed to Superior Sheetmetal Co., Inc., were federal funds provided through HUD for the benefit of federally funded housing programs.

87. Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $6,200.00 to Kimbrough Roofing, Inc., and the funds disbursed to Kimbrough

Roofing, Inc., were federal funds provided through HUD for the benefit of federally funded housing programs.

88.     Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $2,584.00 to Jay Henges Enterprises and the funds disbursed to Jay Henges Enterprises were federal funds provided through HUD for the benefit of federally funded housing programs.

89.     Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $13,148.63 to Kuzila Plumbing Company, Inc., and the funds disbursed to Kuzila Plumbing Company, Inc., were federal funds provided through HUD for the benefit of federally funded housing programs.

90.     Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $14,860.81 to Count on Xcellence Electric Service, and the funds disbursed to Count on Xcellence Electric Service were federal funds provided through HUD for the benefit of federally funded housing programs.

91.     Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $1,376.56 to Safe & Sound Security Systems, Inc., and the funds disbursed to Safe & Sound Security Systems, Inc., were federal funds provided through HUD for the benefit of federally funded housing programs.

92.     Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $15,335.00 to Buck Buchan Landscape Design, and the funds disbursed to Buck Buchan Landscape Design were federal funds provided through HUD for the benefit of federally funded housing programs.

93.     Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $2,800.00 to Four Star Sandblasting, and the funds disbursed to Four Star Sandblasting were federal funds provided through HUD for the benefit of federally funded housing programs.

94.     Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $1,400.00 to The Chester A. Dibble Company, and the funds disbursed to The Chester A. Dibble Company were federal funds provided through HUD for the benefit of federally funded housing programs.

95.     Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $12,600.00 to Energy Wise Heating & Cooling, and the funds disbursed to Energy Wise Heating & Cooling were federal funds provided through HUD for the benefit of federally funded housing programs.

96.     Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $500.00 to Anlab Environmental, and the funds disbursed to Anlab Environmental were federal funds provided through HUD for the benefit of federally funded housing programs.

97.     Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $222.27 to Armor Locksmiths, and the funds disbursed to Armor Locksmiths were federal funds provided through HUD for the benefit of federally funded housing programs.

98.     Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $350.00 to ATI Title Company, LLC, and the funds disbursed to ATI Title Company, LLC were federal funds provided through HUD for the benefit of federally funded housing programs.

99.     Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $165.00 to Call Tyrone Remodeling & Lawn, and the funds disbursed to Call Tyrone

14

Remodeling & Lawn were federal funds provided through HUD for the benefit of federally funded housing programs.

100. Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $1,800.00 to City Treasurer, and the funds disbursed to City Treasurer were federal funds provided through HUD for the benefit of federally funded housing programs.

101. Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $500.00 to Dade Remodeling, and the funds disbursed to Dade Remodeling were federal funds provided through HUD for the benefit of federally funded housing programs.

102. Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $5,900.00 to Design Investments, Inc., and the funds disbursed to Design Investments, Inc. were federal funds provided through HUD for the benefit of federally funded housing programs.

103. Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $1,240.00 to Energy Wise Heating & Cooling, and the funds disbursed to Energy Wise Heating & Cooling were federal funds provided through HUD for the benefit of federally funded housing programs.

104. Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $6,150.00 to ERA Environmental & Safety Co., and the funds disbursed to ERA Environmental & Safety Co. were federal funds provided through HUD for the benefit of federally funded housing programs.

105. Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $650.00 to HDC Consulting Group, Inc., and the funds disbursed to HDC Consulting

15

Group, Inc. were federal funds provided through HUD for the benefit of federally funded housing programs.

106.  Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $12,843.02 to HNTB Architects Engineers, and the funds disbursed to HNTB Architects Engineers were federal funds provided through HUD for the benefit of federally funded housing programs.

107.  Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $4,195.90 to Insurance Agency Corporation, and the funds disbursed to Insurance Agency Corporation were federal funds provided through HUD for the benefit of federally funded housing programs.

108.  Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $400.00 to James Flanagan, MAI, and the funds disbursed to James Flanagan, MAI were federal funds provided through HUD for the benefit of federally funded housing programs.

109.  Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $1,611.73 to Kansas City Power & Light, and the funds disbursed to Kansas City Power & Light were federal funds provided through HUD for the benefit of federally funded housing programs.

110.  Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $17.39 to KCMO Water Services Department, and the funds disbursed to KCMO Water Services Department were federal funds provided through HUD for the benefit of federally funded housing programs.

16

111. Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $2.78 to Lens Kwik Photo, and the funds disbursed to Lens Kwik Photo were federal funds provided through HUD for the benefit of federally funded housing programs.

112. Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $1,156.84 to Manager of Finance-Collection, and the funds disbursed to Manager of Finance-Collection were federal funds provided through HUD for the benefit of federally funded housing programs.

113. Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $1,684.37 to Missouri Gas Service, and the funds disbursed to Missouri Gas Service were federal funds provided through HUD for the benefit of federally funded housing programs.

114. Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $50.00 to Premier Lawn Service, and the funds disbursed to Premier Lawn Service were federal funds provided through HUD for the benefit of federally funded housing programs.

115. Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $215.22 to SBC, and the funds disbursed to SBC were federal funds provided through HUD for the benefit of federally funded housing programs.

116. Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $2,653.50 to She Aro Contracting Service, and the funds disbursed to She Aro Contracting Service were federal funds provided through HUD for the benefit of federally funded housing programs.

117. Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $1,668.77 Southwestern Bell, and the funds disbursed to Southwestern Bell were federal funds provided through HUD for the benefit of federally funded housing programs.

17

118. Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $180.00 to Touch of Distinction, and the funds disbursed to Touch of Distinction were federal funds provided through HUD for the benefit of federally funded housing programs.

119. Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $1,692.00 to Turner Insurance Associates, and the funds disbursed to Turner Insurance Associates were federal funds provided through HUD for the benefit of federally funded housing programs.

120. Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $697.79 to Water Department, and the funds disbursed to Water Department were federal funds provided through HUD for the benefit of federally funded housing programs.

121. Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC disbursed $12,291.00 to Peerless Restoration & Waterproofing, and the funds disbursed to Peerless Restoration & Waterproofing were federal funds provided through HUD for the benefit of federally funded housing programs.

122. Throughout the course of the Tracy Homes rehabilitation and restoration, HEDFC, in total and including acquisition costs, disbursed $604,888.58 in federal funds provided by HUD for the benefit of federally funded housing programs and such funds could have been used for the benefit of federally funded housing programs.

**Reimbursement to United States Department of Housing and Urban Development**

123. HEDFC sold a property located at 1820 Kansas Avenue, Kansas City, Missouri, to a household that was an ineligible purchaser under HUD regulations.

18

124.     As result of HEDFC's sale of the 1820 Kansas Avenue property, the City was required to reimburse HUD $113,575.32 plus interest in the amount of $4,819.75 for improper federal fund expenditures.

125.     HEDFC sold a property located at 1828 Kansas Avenue, Kansas City, Missouri, to a household that was an ineligible purchaser under HUD regulations.

126.     As result of HEDFC's sale of the 1828 Kansas Avenue property, the City was required to reimburse HUD $113,499.97 plus interest in the amount of $4,816.55 for improper federal fund expenditures.

127.     HEDFC sold a property located at 4412 Paseo, Kansas City, Missouri, for $162,441.77 which exceeded the per unit subsidy limit by $10,036.77.

128.     As result of HEDFC's sale of the 4412 Paseo property with expenditures in excess of the per unit subsidy, the City was required to reimburse HUD $10,036.77 plus interest in the amount of $333.78 for improper federal fund expenditures.

129.     HEDFC sold a property located at 2327 Montgall, Kansas City, Missouri, to a household that was an ineligible purchaser under HUD regulations.

130.     As result of HEDFC's sale of the 2327 Montgall property, the City was required to reimburse HUD $21,659.00 plus interest in the amount of $1,963.93 for improper federal fund expenditures.

131.     HEDFC sold a property located at 6226 East 16th Street, Kansas City, Missouri, to a household that was an ineligible purchaser under HUD regulations.

132.     As result of HEDFC's sale of the 6226 East 16th Street property, the City was required to reimburse HUD $60,653.77 plus interest in the amount of $3,669.13 for improper federal fund expenditures.

133.     HEDFC sold a property located at 1530 Freemont, Kansas City, Missouri, to a household that was an ineligible purchaser under HUD regulations.

134.     As result of HEDFC's sale of the 1530 Freemont property, the City was required to reimburse HUD $62,774.92 plus interest in the amount of $7,797.45 for improper federal fund expenditures.

135.     HEDFC funded a project at a property located at 4004 East 53rd Street, Kansas City, Missouri, but, rather than being used for its intended use, the property was demolished by the developer which is an improper federal fund expenditure.

136.     As result of HEDFC's funding of the 4004 East 53rd Street property, the City was required to reimburse HUD $24,538.94 plus interest in the amount of $3,850.65 for improper federal fund expenditures.

137.     In total, HUD required the City to reimburse HUD in the amount of $406,738.69 for the above-identified improper federal fund expenditures by HEDFC plus interest in the amount of $23,251.65.

138.     On January 11, 2005, the City issued a check to HUD from the City's General Fund in the amount of $406,738.69 to reimburse HUD for the above-identified improper federal fund expenditures.

139.     On January 11, 2005, the City issued a check to HUD from the City's General Fund in the amount of $23,251.24 to reimburse HUD the interest accrued on the above-identified improper federal fund expenditures.

## CONCLUSIONS OF LAW

140.    This Court may exercise subject matter jurisdiction over the claims of this complaint pursuant to 28 U.S.C. § 1331 (Federal Question) and 28 U.S.C. § 1367(a) (Supplemental Jurisdiction).

141.    The City's causes of action and right to relief as set forth in its Complaint arise out of certain federal laws, to wit:  the HOME Investment Partnerships Act, 42 U.S.C. Chapter 130, Subchapter II (the "HOME Program") and the Housing and Community Development Act of 1974, 42 U.S.C. Chapter 69, Subchapter I (the "CDBG Program"), and certain implementing or related regulations, 24 C.F.R., Part 92 ("HOME Investment Partnerships Program"), 24 C.F.R., Part 570 ("Community Development Block Grants"), and 24 C.F.R. Part 24, Subpart J.

142.    The particular questions of law necessary for the resolution of this bifurcated claim included within Count II – Breach of Fiduciary Duty of the City's Complaint are within this Court's Supplemental Jurisdiction under 28 U.S.C. § 1367(a) because the bifurcated claim is "so related to claims in the action within such original jurisdiction that [it] form[s] part of the same case or controversy under Article III of the United States Constitution."

143.    Because this Court sits in Missouri, this Court follows Missouri choice of law rules to apply the appropriate state law.  *See Stricker v. Union Planters Bank, N.A.*, 436 F.3d 875 (8th Cir. 2006).

144.    Missouri law applies if the conduct causing the injury occurred in Missouri and if the relationship between the parties is centered in Missouri.  *See id.*

145.    Because the conduct causing the injury in this case occurred in Missouri and because the relationship between the City and HEDFC is centered in Missouri, this Court applies Missouri law to this action.

146. In Missouri, a claim for breach of fiduciary duty requires plaintiff to demonstrate "(1) the existence of a fiduciary relationship between the parties, (2) a breach of that fiduciary duty, (3) causation, and (4) harm." *Dairy Farmers of America, Inc., v. Travelers Ins. Co.*, 292 F.3d 567, 572 (8th Cir. 2002).

147. "A fiduciary is a person having a duty to act primarily for the benefit of another in matters connected with his undertaking." *Id*. (citation omitted).

148. A "fiduciary relationship" exists "when a special confidence is reposed in one who in equity and good conscience is bound to act in good faith, and with due regard to the interests of the one reposing the confidence." *Id*. (citation omitted).

149. In determining whether a fiduciary relationship exists, "the question is always whether or not trust is reposed with respect to property or business affairs of the other." *Shervin v. Huntleigh Securities Corp.*, 85 S.W.3d 737, 741 (Mo. App. 2002)

150. A fiduciary duty "may arise as a result of the special circumstances of the parties' relationship where one places trust in another so that the latter gains superiority and influence over the former." *A.G. Edwards & Sons, Inc., v. Drew*, 978 S.W.2d 386, 394 (Mo. App. 1998).

151. The breach of a fiduciary duty constitutes a tort. *Preferred Physicians Mut. Mgmt. Group v. Preferred Physician Mut. Risk Retention*, 918 S.W.2d 805, 810 (Mo. App. 1996).

152. A fiduciary relationship existed between HEDFC and the City for the following reasons:

a. Over a period of more than twenty years, the City entrusted money to the HEDFC for the purposes of carrying out certain aspects of the City's housing program;

22

b.    The City rightfully expected that the HEDFC would expend these funds solely for the purpose of carrying out the goals of the City's housing program to benefit eligible low income residents to obtain affordable housing, for constructing and rehabilitating such affordable housing, and for redeveloping blighted neighborhoods; and

c.    Because the City relied on the HEDFC to administer certain housing programs as described herein for the benefit of the City and its residents, the City placed significant trust and confidence in the HEDFC to manage those programs and transactions described herein.

153.    Punitive damages are appropriate when it is shown that a defendant knew or should have known that defendant's negligent conduct generated a high degree of probability of injury and acted with conscious disregard of that probability. *See Coon v. American Compressed Steel, Inc.*, 207 S.W.3d 629, 637 (Mo. 2006).

154.    Further, punitive damages are designed to punish and deter. *See Scott v. Blue Springs Ford Sales, Inc.*, 176 S.W.3d 140, 144 (Mo. 2005).

**Blue Hills Take Part LP**

155.    Because the funds loaned by HEDFC to BHTP were federal funds provided by HUD designated for assisting eligible low income residents to obtain affordable housing, for constructing and rehabilitating such affordable housing, and for redeveloping blighted neighborhoods and HEDFC owed a fiduciary duty to the City to at a minimum exercise good faith and due diligence in administering and using such funds, HEDFC was required to administer and use such funds according to their designated purpose.

23

156.    HEDFC breached its fiduciary duty to the City by failing and neglecting to enforce the loan contracts in permitting the Troost Apartments loan to become three years delinquent and permitting the Brush Creek Apartments loan to become five years delinquent.

157.    HEDFC breached its fiduciary duty to the City by accepting a discounted payment for the loans that resulted in a combined write-down of $82,473.00 without first attempting to obtain a better value for the loans through a public and competitive process.

158.    HEDFC's breach of its fiduciary duty to the City resulted in the loss of federal funds in the amount of $85,473.00 that could have been used for the benefit of federally funded housing programs.

159.    Due to HEDFC's breach of its fiduciary duty to the City and the resulting loss of federal funds in the amount of $82,473.00, the City has been damaged in the amount of $82,473.00.

160.    HEDFC's failure to comply with the applicable HUD regulations, by absolutely ignoring such regulations, of which HEDFC was commanded to be fully aware, evidenced HEDFC's conscious disregard of its fiduciary duty to the City and its obligations under HUD regulations.

### Mount Cleveland II, Inc.

161.    Because the funds paid to Karl Arterbury were federal funds provided by HUD designated for assisting eligible low income residents to obtain affordable housing, for constructing and rehabilitating such affordable housing, and for redeveloping blighted neighborhoods and HEDFC owed a fiduciary duty to the City to at a minimum exercise good faith and due diligence in administering and using such funds, HEDFC was required to administer and use such funds according to their designated purpose.

162.    HEDFC breached its fiduciary duty to the City and neglected to use such funds according to their designated purpose by paying Mr. Arterbury, despite the conflict of interest, from

24

federal funds for consulting services provided less than one year after he was no longer employed by HEDFC.

163.    HEDFC's breach of its fiduciary duty to the City resulted in the loss of federal funds in the amount of $16,000.00 that could have been used for the benefit of federally funded housing programs.

164.    Due to HEDFC's breach of its fiduciary duty to the City and the resulting loss of federal funds in the amount of $16,000.00, the City has been damaged in the amount of $16,000.00.

165.    HEDFC's failure to comply with the applicable HUD regulations, by absolutely ignoring such regulations, of which HEDFC was commanded to be fully aware, evidenced HEDFC's conscious disregard of its fiduciary duty to the City and its obligations under HUD regulations.

### Roanoke Court Associates

166.    Because the funds loaned by HEDFC to Roanoke Court Associates were federal funds provided by HUD designated for assisting eligible low income residents to obtain affordable housing, for constructing and rehabilitating such affordable housing, and for redeveloping blighted neighborhoods and HEDFC owed a fiduciary duty to the City to at a minimum exercise good faith and due diligence in administering and using such funds, HEDFC was required to administer and use such funds according to their designated purpose.

167.    HEDFC breached its fiduciary duty to the City by failing and neglecting to enforce the loan contract in permitting the Roanoke Court loan to become twelve years delinquent.

168.    HEDFC breached its fiduciary duty to the City by accepting a discounted payment for the loan that resulted in a write-down of $175,850.00 without first attempting to obtain a better value for the loan through a public and competitive process.

25

169.     HEDFC's breach of its fiduciary duty to the City resulted in the loss of federal funds in the amount of $175,850.00 that could have been used for the benefit of federally funded housing programs.

170.     Due to HEDFC's breach of its fiduciary duty to the City and the resulting loss of federal funds in the amount of $175,850.00, the City has been damaged in the amount of $175,850.00.

171.     HEDFC's failure to comply with the applicable HUD regulations, by absolutely ignoring such regulations, of which HEDFC was commanded to be fully aware, evidenced HEDFC's conscious disregard of its fiduciary duty to the City and its obligations under HUD regulations.

## East Meyer I

172.     Because the funds loaned by HEDFC to East Meyer I were federal funds provided by HUD designated for assisting eligible low income residents to obtain affordable housing, for constructing and rehabilitating such affordable housing, and for redeveloping blighted neighborhoods and HEDFC owed a fiduciary duty to the City to at a minimum exercise good faith and due diligence in administering and using such funds, HEDFC was required to administer and use such funds according to their designated purpose.

173.     HEDFC breached its fiduciary duty to the City by failing and neglecting to properly account for federal funds in its possession.

174.     HEDFC breached its fiduciary duty to the City by selling the East Meyer I properties without making any attempt to determine the market value of the properties prior to creating a minimum sale price; making any attempt to publicly and competitively seek the highest price; or making any other attempt to sell the sixteen properties for more than the minimum price.

175.     HEDFC's breach of its fiduciary duty to the City resulted in the loss of federal funds in the amount of $156,000.00 that could have been used for the benefit of federally funded housing programs.

176.     Due to HEDFC's breach of its fiduciary duty to the City and the resulting loss of federal funds in the amount of at least $156,000.00, the City has been damaged in the amount of $156,000.00.

177.     HEDFC's failure to comply with the applicable HUD regulations, by absolutely ignoring such regulations, of which HEDFC was commanded to be fully aware, evidenced HEDFC's conscious disregard of its fiduciary duty to the City and its obligations under HUD regulations.

**Metropolitan Housing, L.P.**

178.     Because the funds loaned by HEDFC to Metropolitan Housing, L.P. were federal funds provided by HUD designated for assisting eligible low income residents to obtain affordable housing, for constructing and rehabilitating such affordable housing, and for redeveloping blighted neighborhoods and HEDFC owed a fiduciary duty to the City to at a minimum exercise good faith and due diligence in administering and using such funds, HEDFC was required to administer and use such funds according to their designated purpose.

179.     HEDFC breached its fiduciary duty to the City by failing and neglecting to enforce the loan contract in permitting the Metropolitan Housing loan to become 126 months delinquent.

180.     HEDFC's breach of its fiduciary duty to the City resulted in the loss of federal funds in the amount of $148,050.00 that could have been used for the benefit of federally funded housing programs.

27

181.     Due to HEDFC's breach of its fiduciary duty to the City and the resulting loss of federal funds in the amount of $148,050.00, the City has been damaged in the amount of $148,050.00.

182.     HEDFC's failure to comply with the applicable HUD regulations, by absolutely ignoring such regulations, of which HEDFC was commanded to be fully aware, evidenced HEDFC's conscious disregard of its fiduciary duty to the City and its obligations under HUD regulations.

## Tracy Homes

183.     Because the funds loaned by HEDFC to purchase, rehabilitate and restore the Tracy Homes were federal funds provided by HUD designated for assisting eligible low income residents to obtain affordable housing, for constructing and rehabilitating such affordable housing, and for redeveloping blighted neighborhoods and HEDFC owed a fiduciary duty to the City to at a minimum exercise good faith and due diligence in administering and using such funds, HEDFC was required to administer and use such funds according to their designated purpose.

184.     HEDFC breached its fiduciary duty to the City by purchasing, rehabilitating and restoring the Tracy Homes for the purpose of providing model homes for the Beacon Hill Development and neglecting to use such funds according to their designated purpose by disbursing $604,888.58 for such purchase, rehabilitation and restoration.

185.     HEDFC breached its fiduciary duty to the City by purchasing, rehabilitating and restoring the Tracy Homes without first employing a public and competitive process for selecting the contractors that performed the work on the Tracy Homes and disbursing $604,888.58 in payment to such contractors without properly procured contracts.

28

186.     HEDFC's breach of its fiduciary duty to the City resulted in the loss of federal funds in the amount of $604,888.58 that could have been used for the benefit of federally funded housing programs.

187.     Due to HEDFC's breach of its fiduciary duty to the City and the resulting loss of federal funds in the amount of $604,888.58, the City has been damaged in the amount of $604,888.58.

188.     HEDFC's failure to comply with the applicable HUD regulations, by absolutely ignoring such regulations, of which HEDFC was commanded to be fully aware, evidenced HEDFC's conscious disregard of its fiduciary duty to the City and its obligations under HUD regulations.

**Reimbursement to United States Department of Housing and Urban Development**

189.     Because the funds involved in the various transactions that required the City to reimburse HUD from the City's General Fund on January 11, 2005, were federal funds provided by HUD designated for assisting eligible low income residents to obtain affordable housing, for constructing and rehabilitating such affordable housing, and for redeveloping blighted neighborhoods and HEDFC owed a fiduciary duty to the City in administering and using such funds, HEDFC was required to administer and use such funds according to their designated purpose.

190.     HEDFC breached its fiduciary duty to the City by neglecting to use such funds according to their designated purpose by selling homes to ineligible buyers and funding ineligible projects that resulted in the City reimbursing HUD in the amount of $406,738.69 plus interest in the amount of $23,251.24.

191.     HEDFC's breach of its fiduciary duty to the City resulted in the loss of the City's General Fund monies in the amount of $406,738.69 plus interest in the amount of $23,231.24.

29

192.     Due to HEDFC's breach of its fiduciary duty to the City and the resulting loss of the City's General Fund monies in the amount of $406,738.69 plus interest in the amount of $23,231.24, the City has been damaged in the total amount of $429,969.93.

193.     HEDFC's failure to comply with the applicable HUD regulations, by absolutely ignoring such regulations, of which HEDFC was commanded to be fully aware, evidenced HEDFC's conscious disregard of its fiduciary duty to the City and its obligations under HUD regulations.

**Damages**

194.     But for HEDFC's breach of its fiduciary duty to the City, the City would not have lost the use of federal funds in the amount of $1,613,215.51 that could have been used for the benefit eligible low income residents to obtain affordable housing, for constructing and rehabilitating such affordable housing, and for redeveloping blighted neighborhoods.

195.     Due to HEDFC's breach of its fiduciary duty to the City and the resulting loss of federal funds in the amount of $1,613,215.51, the City has been damaged in the amount of $1,613,215.51.

**Punitive Damages**

196.     With each of the above transactions, HEDFC's failure to comply with the applicable HUD regulations, by absolutely ignoring such regulations, of which HEDFC was commanded to be fully aware, evidenced HEDFC's conscious disregard of its fiduciary duty to the City and its obligations under HUD regulations.

197.     Because HEDFC breached its fiduciary duty to the City with conscious disregard, the City is entitled to punitive damages in an amount three times its actual damages in the amount of  $4,839,646.53.

# JUDGMENT

Upon this matter being heard and fully considered,

IT IS THEREFORE ORDERED that Plaintiff, The City of Kansas City, Missouri, is hereby awarded judgment for actual damages in the amount of One Million, Six Hundred and Thirteen Thousand, Two Hundred and Fifteen dollars and Fifty-One cents ($1,613,215.51) and is hereby awarded judgment for punitive damages in the amount of Four Million, Eight Hundred and Thirty-Nine Thousand, Six Hundred and Forty-Six dollars and Fifty-Three cents ($4,839,646.53), plus costs as provided by law, against Defendant, the Housing and Economic Development Financial Corporation.

s/ Gary A. Fenner
GARY A. FENNER, JUDGE
UNITED STATES DISTRICT COURT

DATED:  March 7, 2007